**PINE CREST PREPARATORY SCHOOL, INC., Appellant,**

v.

**John PHELAN, Appellee.**

**No. 76–2355.**

United States Court of Appeals, Fourth Circuit.

Argued April 5, 1977.

Decided June 28, 1977.

Thomas M. Starnes, Patton, Starnes, Thompson & Daniel, Morganton, N. C., for appellant.

---

7. L. Tapia Salinas, La Regulacion Juridica del Transporte Aereo 107 (1953).

R. S. Jones, Jr., Jones, Jones & Key, Franklin, N. C., and James U. Downs, Franklin, N. C., for appellee.

Before CLARK, Associate Justice,* HAYNSWORTH, Chief Judge, and RUSSELL, Circuit Judge.

PER CURIAM:

In this diversity case, John Phelan, a realtor of Highlands, North Carolina, appellee, recovered a judgment of $35,000, covering a real estate sales commission he claimed from Pine Crest Preparatory School, Inc., a private preparatory school of Fort Lauderdale, Florida (Pine Crest). The latter also owned and operated a camp facility in conjunction with the School, which was located near Highlands. Phelan's fee on the sale of this camp facility is the only matter involved here.

The legal issues have to do (1) with the failure of the Court to grant Pine Crest's motion for directed verdict under the Federal Rules of Civil Procedure Section 50(a); and its refusal to grant Pine Crest's motion *non obstante veredicto*, (2) The refusal of the Court to grant Pine Crest's motion for a new trial; and (3) prejudice as to the introduction in evidence of the contract of sale as to Phelan's fee.

We have carefully considered these issues and affirm the judgment.

1. *Factual Considerations:*

There is little difference between the parties as to the ultimate facts. It is not disputed that initially Pine Crest contacted Phelan through one of its twenty four directors (Hobbs) in an effort to determine the value of the camp property. After advising Hobbs that, in his judgment, the property was worth approximately $350,000, Phelan, on May 1, 1973, wrote Hobbs, who passed the letter on to the Board of Directors, that he had interested several people in the property and believed that it would bring in the neighborhood of $500,000 and that two or three investors might make that or a higher offer; that at the next Board meeting a resolution was adopted advising Phelan that the property was not on the market but that if a proper offer in excess of $500,000 was received, it would be considered. Phelan then got busy and secured an offer of $550,000 from Richard Brickman which he submitted to the President of the Board by formal contract providing for a $50,000 commission for Phelan from the proceeds. On October 29, 1973, the Board appointed a negotiating committee to study the contract and contact the purchaser, Brickman. However, Phelan's proposed contract was rejected, and he was so advised. Soon thereafter, without notifying Phelan, the Negotiating Committee contacted Brickman, and on November 2, 1973, the latter submitted a purchase and sale agreement to Pine Crest's attorney, sending a copy to Phelan. By separate letter to Phelan, Brickman called the attention of the former to the reservation in the proposal made to him by Pine Crest, as to his (Brickman) "working out a separate brokerage agreement." On November 5, Phelan advised the President of Pine Crest that he anticipated a commission payment of $50,000. Brickman was advised that the Board was obtaining appraisals of the property, which would delay any sale, and, as a consequence, Brickman asked Phelan to return his $5000 earnest money deposit he had put up on the initial offer, and further stated, "I hope that once the appraisals are in, you will be able to get a listing and deal only with me until I have rejected the deal." Phelan returned the $5,000 to Brickman. At a November 26 Board meeting, it was reported that the appraisals could not be obtained until January 1974, and that Brickman "the possible purchaser of the property" had indicated, as requested by the Board, that Pine Crest could operate the Camp in 1974.

In January 1974, Phelan was in Florida and called the President of the Board of Pine Crest on the telephone. The President asked Phelan to re-open the initial contract that he had submitted to the Board and use it in order to expedite the consummation of

---

* Associate Justice Tom C. Clark, United States Supreme Court (Ret.), is sitting by designation.

the sale. Phelan told him that this could not be done because of the dates in that offer. Phelan asked the President if Pine Crest was ready to sell and was assured that they were and gave Phelan the address of the Pine Crest attorney so he might check as to the same. Phelan had difficulty reaching the attorney, but after doing so, told him to get in touch with Brickman and to let him know the outcome. He never heard further until he received a copy of the contract which this suit involves.

On March 13, 1974, Pine Crest entered into a "Purchase and Sale Agreement" with Brickman on the North Carolina camp property for $500,000. The contract included paragraph 10 on "Brokerage" wherein Brickman agreed to pay any and all real estate commissions due to Phelan or any other broker on the sale. Phelan never received any payment and, accordingly, brought this suit.

2. *The Verdict of the Jury:*

■ The case was submitted to the jury on special issues, the form of which is not attacked, and its answers were that (1) Pine Crest by its act and conduct, impliedly agreed to pay Phelan a commission for procuring a buyer for the camp property; (2) Phelan procured a buyer who was ready, willing and able to buy the camp property; and (3) Phelan was entitled to recover $35,-000 for his services.

■ It is true that Phelan did not have a written listing from the Board, but that is not requisite under North Carolina law. *Carver v. Britt*, 241 N.C. 538, 85 S.E.2d 888 (1955). However the Board by its Resolution of May 15, 1973, invited him to seek out purchasers who would make "a proper offer in excess of $500,000" and it "would be considered." Phelan sought out prospects and came up with Brickman's offer of $550,000. The Board rejected the offer out of hand, contacted Brickman itself, and a few months later, sold the same property to him for $500,000 net. Cf. *O'Donnell v. Carr*, 189 N.C. 77, 126 S.E. 112 (1925). We also note that the Board also wrote into the contract (Par. 10—Brokerage) that Brickman would pay any commission which Phelan might recover by reason of its conduct.

We find the record replete with evidence supporting the jury's findings. In essence, Phelan found Brickman at the instance of the Board of Pine Crest who stole him away through secret negotiations that culminated in the sale of the property.

3. *The Admission into Evidence of Paragraph 10:*

■ Pine Crest also insists that the District Court erred in admitting into evidence Paragraph 10 of the contract which had to do with "Brokerage." This paragraph provides that Brickman, rather than Pine Crest, will pay any sale commission due Phelan or any other real estate dealer. Pine Crest admits that this paragraph "may have been remotely relevant to the issues . . . ." but that its admission into evidence was highly prejudicial.

We find the paragraph the very heart of the controversy. Contra to the normal real estate sales contract, it provides that the purchaser (Brickman) pays the sales fee, if there is any, rather than the seller. This indicates that Pine Crest thought there was more to Phelan's claim than they admitted. Indeed, he was made a third party beneficiary to the agreement. Furthermore, there was unchallenged evidence before the jury that the clause was in the contract but the contract itself was the best evidence of the same. See Tr. 84, 85.

■ Pine Crest depends upon Rule 403 of the Federal Rules of Evidence. But that rule relates only to *unfair* prejudice, confusion of issues or the misleading of the jury. There is nothing *unfair* in placing in evidence the written contract providing for the indemnity where oral evidence—without objection—is already in the record; rather than confusing the jury, it clarifies the issue and could in no way be classified as "misleading," when, in fact, it merely corroborates that testimony in evidence. Finally, it clearly shows that Brickman was getting a windfall by securing the property for $50,000 less than he had earlier agreed

to pay. We conclude that Paragraph 10 was properly admitted.

The judgment is

Affirmed.