**James MULLEN, Plaintiff–Appellant,**

**v.**

**PRINCESS ANNE VOLUNTEER FIRE COMPANY, INC., a Maryland Corporation, Defendant–Appellee.**

**No. 87–1198.**

United States Court of Appeals, Fourth Circuit.

Argued June 8, 1988.

Decided Aug. 9, 1988.

---

Peter Brandon Bayer (Susan Goering, American Civil Liberties Union of Maryland, C. Christopher Brown, Brown & Goldstein, Baltimore, Md., on brief), for plaintiff-appellant.

James J. Doyle, Jr. (Mary R. Craig, Doyle & Langhoff, Baltimore, Md., on brief), for defendant-appellee.

Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, WILKINSON, Circuit Judge, and BUTZNER, Senior Circuit Judge.

WILKINSON, Circuit Judge:

James Mullen appeals from a jury verdict in favor of the Princess Anne Volunteer Fire Company in his suit alleging racial discrimination in the company's membership policies. Mullen's principal challenge is to the district court's exclusion of evidence that members of the company routinely used racial slurs and epithets. We agree with Mullen that the district court should have admitted evidence that racial slurs were used by those making the membership decision. *See* Fed.R.Evid. 403. In the specific circumstances of this case, however, the evidence supporting the jury's verdict is such that exclusion of the evidence did not affect the substantial rights of the parties. *See* Fed.R.Civ.P. 61. For this reason, and because Mullen's other assignments of error are without merit, we affirm the judgment of the district court.

I.

The defendant, Princess Anne Volunteer Fire Company, is the sole provider of firefighting services in Princess Anne, Maryland. In 1986 the company answered approximately 150 fire calls and 700 ambu-

lance calls. Membership is voluntary, and the members of the company receive no compensation for their work.

In order to qualify for membership in the company, an applicant must be between 18 and 45 years old, reside within a two mile radius of the firehouse, and receive the recommendations of two current members of the company. Members, with the exception of those who have served over twenty years, are required to attend at least fifty percent of company meetings, and to respond to at least thirty-five percent of emergency calls. New applicants must initially seek to become probationary members, and must complete a training course during the probationary year. In order to be accepted for probationary membership, an applicant must receive the affirmative votes of seven-eighths of the firefighters voting on the application. A seven-eighths vote is similarly required to move from probationary to active status, to become an honorary member, and for expulsion of a member.

Prior to this litigation, there had never been a black member of the company. Plaintiff James Mullen, who is black, applied for membership in December 1985. The controversy centered on his physical capacity to perform the job. Mullen had a history of back problems. He was listed by the Veterans Administration as sixty percent permanently disabled and forty percent temporarily disabled, and received $1,500 monthly in disability benefits. Mullen displayed Disabled American Veteran license tags on his car and parked in handicapped parking spaces. For the past ten years, Mullen had been pursuing a college degree, and worked only sporadically. He had not performed any physical labor since 1968 or 1969. Mullen was well known in the small (approximately 1,500 residents) community, as he had been a plaintiff in two civil rights suits against the town and county and run for a seat on the town council.

Mullen's application to the company was sponsored by two current members, as was required by the company bylaws. In response to a question on the application form, Mullen stated that he had no physical disability that would prevent him from performing the duties of a firefighter. Mullen was interviewed by a committee of three company members, and again stated that his disability would not interfere with his ability to fight fires. The company membership considered Mullen's application on February 20, 1986. It rejected him by a secret ballot vote of 27 to 0 with 5 abstentions.

After his rejection by the company, Mullen brought this case under 42 U.S.C. §§ 1981, 1982, and 1983, seeking damages, injunctive, and declaratory relief. The case was tried before a jury in June, 1987. Mullen presented testimony to the effect that there was an atmosphere of racial hostility in the town, and that the fire company had a reputation for racial prejudice. Although two black witnesses testified that they felt they had been discouraged from applying years earlier, only Mullen testified that he had actually applied and been rejected. Mullen's attorney questioned numerous members of the company with regard to their motivations in rejecting Mullen's application. The district court judge ruled, however, that Mullen could not question the members as to their use of racial slurs and epithets such as "nigger." In support of this line of questioning, Mullen proffered numerous excerpts from depositions in which members of the company stated that they used terms such as "nigger" to describe black persons and had heard other members use such terms.

At the close of Mullen's evidence, the district court dismissed his § 1982 claim. At the close of the entire case, the district court dismissed Mullen's claim for punitive damages. The remainder of the case went to the jury, which returned a verdict in favor of the company on June 19, 1987. Mullen moved for injunctive relief requiring the company to take steps to remedy the lack of minority membership despite the verdict against him. The district court denied this motion. Mullen appeals.

## II.

Mullen's main contention on appeal is that the district court erred in ex-

cluding evidence that members of the Fire Company used racial slurs. We agree. Where a plaintiff alleges discrimination in a hiring or membership decision, the plaintiff must show that racial animus was a motivating factor in the decision. *See General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 382–91, 102 S.Ct. 3141, 3145–50, 73 L.Ed.2d 835 (1982). The use of racially offensive language by the decisionmaker is relevant as to whether racial animus was behind the membership decision, and was proper evidence for the jury to consider.

Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Use of racial aspersions obviously provides an indication that the speaker might be more likely to take race into account in making a hiring or membership decision. The probative value of this evidence is apparent from the nature of the words involved. Representative is the deposition testimony of Roger Garner, who when asked what term he used to refer to blacks stated: "it's the regular thing, a nigger." The user of such terms intends only one thing: to degrade those whom he describes in the most offensive manner. General use of these words, though obviously not conclusive evidence that a particular decision was made with racial animus, is clearly relevant to determining whether it was. It would be ironic indeed to conclude that use of the language of prejudice is irrelevant in a civil rights suit. Racial slurs represent the conscious evocation of those stereotypical assumptions that once laid claim to the sanction of our laws. Such language is symbolic of the very attitudes that the civil rights statutes are intended to eradicate.

The company argues that, even if the evidence was relevant, the district court's exclusion should be affirmed on the basis of Fed.R.Evid. 403. Rule 403 allows the district court, in its discretion, to exclude evidence that *is* relevant, "if its probative value is substantially outweighed by the danger of unfair prejudice." Review of the exclusion of racial slurs thus entails a dual inquiry. We must first look to the probative value of the evidence on the question of racial animus, and then examine the possibility that the evidence will cause unfair prejudice to the defendant.

Where a plaintiff seeks to prove discriminatory intent, the probative value of statements revealing the racial attitudes of the decisionmaker is great. This is so because of the inherent difficulty of proving state of mind. As the Supreme Court has noted, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). Racial statements uttered by those responsible for the hiring decision may be indicative of such processes. *See Wilson v. City of Aliceville*, 779 F.2d 631 (11th Cir.1986); *Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir.1985) (both reversing exclusions under Rule 403 of evidence that decisionmakers used racial slurs); *see also Bell v. City of Milwaukee*, 746 F.2d 1205, 1275 (7th Cir.1984) (evidence of police officer's racist comments probative and admissible under Rule 403 for showing racial animus, in civil rights suit brought by black shooting victim). This court has also recognized that racial statements may be important evidence of discriminatory intent. *See Abasiekong v. City of Shelby*, 744 F.2d 1055, 1058 (4th Cir.1984).

The principle is well-established that prior acts and statements should be admitted where necessary to show state of mind. This is the policy reflected in Fed.R.Evid. 404(b), under which evidence of prior bad acts which would otherwise be inadmissible may be introduced to show intent, motive, knowledge, and the like. Admission of such evidence under Rule 404(b) is of course subject to the balancing analysis of Rule 403, *see, e.g., United States v. Beahm*, 664 F.2d 414, 417 (4th Cir.1981), but the potential importance of evidence showing state of mind is properly weighed in the balance. Thus in *Roshan v. Fard*, 705 F.2d 102 (4th Cir.1983), the court reversed the exclusion under Rule 403 of the

plaintiff's prior narcotics conviction in his action for assault against a police informant. Despite the potential of such evidence for unfair prejudice, the court held that the evidence of the conviction, in which the informant participated, must be admitted on the issue of the plaintiff's motives in the altercation. *Id.* at 105; *accord Bowden v. McKenna,* 600 F.2d 282 (1st Cir.1979).

The company, however, argues that these cases are inapposite, and that exclusion of the racial statements here was proper, because the statements were not directly connected to the plaintiff or the membership selection process. It points out that in *Miles, supra,* the racial statements pertained to the hiring process, and in *Wilson, supra,* referred to the plaintiff himself. It is true that the statements by the ten firefighters indicated only generally that they resorted to terms of racial opprobrium or heard other members of the company use them. We reiterate, however, that the value of these statements in revealing state of mind may still be significant despite the fact that the statements did not relate to the specific decision at issue. *Cf. Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1423 (7th Cir.1986) (evidence of past racial statement and incidents of harassment unrelated to specific disputed action properly admissible to show racial attitudes). Indeed, the company's contention goes more to the weight that the jury might give to the evidence than to its admissibility. A defendant would always be free to argue to the jury that the general use of racial epithets was no indication of the attitude with which it approached a particular minority application.

■ Rule 403 simply erects no per se barrier to the introduction of customary mannerisms of speech that may shed light on the motives of a contested decision. Such evidence may be the only way in which discriminatory attitudes are revealed, for statements of racial animosity may remain absent from official channels, only to emerge in a more colloquial context. We decline to discount the probative value of a decisionmaker's speech in an unofficial

capacity, for it is open to the jury to conclude that the manifestation of racially discriminatory attitudes cannot be rigidly compartmentalized.

The company contends that the "danger of unfair prejudice" nonetheless supports the exclusion of the firefighters' use of the term "nigger." The company does not specify the nature of the "unfair prejudice" that it claims. An objection to the "prejudice" to the company's case if the jury were to believe the use of racial slurs makes it more likely that a decisionmaker harbors discriminatory intent is obviously without merit. All relevant evidence is "prejudicial" in the sense that it may prejudice the party against whom it is admitted. Rule 403, however, is concerned only with "unfair" prejudice. That is, the possibility that the evidence will excite the jury to make a decision on the basis of a factor unrelated to the issues properly before it. *See, e.g., Pine Crest Preparatory School, Inc. v. Phelan,* 557 F.2d 407, 409 (4th Cir. 1977); 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 403[03] (1986).

■ The emotional content of the proffered evidence fails to support its exclusion. Testimony concerning racial remarks is certain to be emotionally charged. The emotional content of evidence, however, can "require exclusion only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *Morgan v. Foretich,* 846 F.2d 941–945 (4th Cir.1988). We are not convinced that the jury would have been unable properly to consider the evidence of racial statements. The district court might have issued a cautionary instruction to the effect that the racial statements were only to be considered on the question of discriminatory intent in Mullen's particular case, but the outright exclusion of the evidence was improper.

The source of the emotional reaction that the company fears illustrates why the danger of "unfair" prejudice is not so substantial as to outweigh probative value here.

Words produce emotion as a result of the ideas they represent. The epithets involved here are offensive precisely because they convey the idea of racial bigotry. Whatever hostility a juror hearing the use of these epithets would feel results from a belief that the words reveal a discriminatory outlook. The emotional reaction claimed to be unfairly prejudicial is thus closely tied to the inquiry into state of mind that is specifically required by § 1981. A juror may well disapprove of one who harbors discriminatory intent, yet this disapproval may be directed to a proper element of the controversy.

Jury trials are not antiseptic events, and in a case involving racial discrimination, upsetting facts may well emerge. The general policy of the Federal Rules, however, is that all relevant material should be laid before the jury as it engages in the truth-finding process. *See generally* 1 Weinstein's Evidence, *supra*, at 403–46 to 403–50. For this reason, in reviewing a decision under Rule 403, the court must "look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Koloda v. General Motors Parts Division*, 716 F.2d 373, 377 (6th Cir.1983). We are mindful, of course, that the discretion of the district court in rulings under Rule 403 is very broad and that the Rule is not amenable to an appellate blueprint. *See, e.g., Estate of Larkins v. Farrell Lines, Inc.*, 806 F.2d 510, 515 (4th Cir. 1986). On the other hand, courts are obligated to use the power conferred by Rule 403 sparingly, and to remember that the Federal Rules favor placing even the nastier side of human nature before the jury if to do so would aid its search for truth.

We hold therefore that Mullen presented evidence from which a reasonable juror could have concluded that racial slurs and epithets were an aspect of everyday conversation at the firehouse among the very members who voted on his application. The jury was entitled to consider this evidence in reaching a decision in the case.

## III.

Despite our finding of error, on the singular facts presented in this case we decline to disturb the judgment entered on the jury's verdict. The erroneous exclusion of evidence is not cause for reversal unless a refusal to reverse the verdict below would be "inconsistent with substantial justice." We must therefore disregard any error that did not "affect the substantial rights of the parties." Fed.R.Civ.P. 61; 28 U.S.C. § 2111. A decision not to reverse the judgment below on this basis "affects only the party litigants by avoiding an unnecessary remand." *Troy v. City of Hampton*, 756 F.2d 1000, 1010 (4th Cir. 1985) (Ervin, J., dissenting). While the exclusion of probative evidence is not to be lightly disregarded, it is clear that the jury's verdict was supported by overwhelming evidence that Mullen was not physically suited to be a firefighter. We are not persuaded that the admission of the contested evidence would have produced any different result.

The evidence as to Mullen's disability was abundant. Mullen was rated by the Veteran's Administration as sixty percent totally disabled and forty percent temporarily disabled. As a result of his one-hundred percent physical disability, Mullen was receiving $1,500 in monthly disability benefits. Mullen had been unemployed for long periods of time, and testified that he had done no physical labor since 1968 or 1969, the time of his last back operation. Mullen himself testified that doctors may have advised him that he was permanently unable to perform physical labor. The record is also replete with evidence that Mullen's disability, although not the specifics of his condition, was well-known in Princess Anne generally, and to members of the company.

Extensive evidence in the record serves only to confirm a fact that is self-evident—firefighting is strenuous, hazardous, demanding work. Members of the company testified that they must wear heavy protective gear in fighting fires, and are often required to lift heavy loads. Dependable firefighting services are crucial to the public, and the danger involved in the work

requires that each firefighter be confident in the abilities and stamina of his fellow workers. Firefighting is simply a job for which physical fitness is a most basic qualification.

Review of a judgment for the effect of an evidentiary error is not to be divorced from common sense. Any realistic view of the firefighter's task could leave no doubt that it is ill-suited to an applicant who is one hundred percent disabled due to a back injury. *Cf. Smith v. Olin Chemical Corp.,* 555 F.2d 1283, 1286–88 (5th Cir.1977) (en banc) (holding in a Title VII disparate impact case that the requirement of a healthy back is so manifestly related to performance of certain employment that employer need not prove "business necessity"). This is the reality reflected in § 504 of the Rehabilitation Act, under which applicants must be "otherwise qualified" to perform the work they seek in order to come within the Act's provisions. *See* 29 U.S.C. § 794; *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed. 2d 980 (1979) (in order to be otherwise qualified, applicant must be able to meet all of the program's requirements in spite of his handicap). Some conditions simply are not compatible with certain lines of work. *Cf. Forrisi v. Bowen,* 794 F.2d 931 (4th Cir.1986) (applicant with acrophobia not otherwise qualified to be a utility lineman). We are persuaded that the jury found Mullen's condition to be incompatible with firefighting.

Although the district court sustained numerous objections to Mullen's questions to firefighters on their use of racial epithets, the allegation of racial animus was squarely before the jury. Mullen presented general evidence of discrimination in the county and town, and repeatedly questioned company members about, for example, their membership in all-white organizations. He also presented evidence in an attempt to establish that the company's proffered reason for the rejection was a pretext. Likewise, as we have discussed, the company put on extensive evidence concerning Mullen's lack of qualifications. In short, the jury had before it an abundance of evidence from which it could answer the ultimate question in an employment discrimination case: "which party's explanation of the employer's motivation it believes." *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482.

Mullen's own post-trial motion for injunctive relief describes the answer to that question: "the jury has found that the Princess Anne Volunteer Fire Company (PAVFC) rejected Mr. Mullen's application due to his back condition rather than his race." However deficient the general membership practices at the firehouse, the jury verdict represented the fact that it is difficult to place those practices squarely before the court through the case of a plaintiff with so obvious a nonracial barrier to his application. The evidence firmly supported this verdict, and there is no reason to believe that letting the verdict stand would be "inconsistent with substantial justice." Fed.R.Civ.P. 61.

### IV.

Mullen makes several additional challenges to the judgment below. He contends that the district court improperly allocated the burden of proof, and that the district court erred in not granting injunctive relief. Neither of these arguments provides a basis for disturbing the judgment.

### A.

The district court allocated the burden of proof in this case under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The *Burdine* standard was developed in the Title VII disparate treatment context, and is applicable to cases, such as suits under § 1981 and § 1983, where proof of discriminatory intent is required. *See Gairola v. Commonwealth of Virginia Department of General Services,* 753 F.2d 1281, 1285 (4th Cir. 1985); *Abasiekong v. City of Shelby,* 744 F.2d 1055, 1058 (4th Cir.1984). The shifting burdens of production under this stan-

dard are well known, and we see no reason to repeat them here. *See Burdine,* 450 U.S. at 253–56, 101 S.Ct. at 1093–95.

 In reviewing the district court's jury instructions, we note at the outset that the instructions were overly complex. The shifting burdens of production of *Burdine* are intended to aid the judge in organizing the evidence to be presented. They are beyond the function and expertise of the jury, which need never hear the term *"prima facie* case." *See Nelson v. Green Ford, Inc.,* 788 F.2d 205, 207 (4th Cir.1986); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1016 (1st Cir.1979). Although the district court should have instructed the jury in a more simple fashion, it is clear that the charge in its totality sufficiently focused the eye of the jury on the finding it was to make. As the district court summarized its instructions, "The plaintiff must prove that the defendant intentionally discriminated against him because of his race." We see no flaw in the instructions that calls for reversal.

 Mullen's first two specific challenges to the district court's instructions are similar. Under the *Burdine* analysis, the burden of persuading the trier of fact that the defendant's actions were motivated by unlawful discrimination remains at all times with the plaintiff. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Mullen contends, however, that he has shown a "historic pattern" of discrimination. On this basis he argues first that the burden of proof should rest with the defendant to show by clear and convincing evidence that rejection of the plaintiff was not motivated by race, citing *Evans v. Harnett County*

*Board of Education,* 684 F.2d 304 (4th Cir.1982) and *Love v. Alamance County Board of Education,* 757 F.2d 1504 (4th Cir.1985). *See Keyes v. School District,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). In the alternative, Mullen contends that the burden of proof should properly be on the defendant to prove by a preponderance of the evidence that its action was not the product of racial animus, citing *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) and *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

These arguments share a common flaw: each of the decisions cited governs the allocation of the burden of proof in a specific situation where there has been a prior judicial finding of racial discrimination. *Evans* and *Love* shift the burden of persuasion where a plaintiff alleges discrimination by a school district that has previously been found to have intentionally discriminated in a substantial part of the system. *Teamsters* and *Franks* establish that where a court has found a pattern or practice of discrimination in a class pattern-or-practice suit, each member of the class is presumptively entitled to relief. Both the specialized contexts of school desegregation and the class pattern-or-practice suit are far different from that presented here. What is more, each of the cases Mullen cites involved a *prior* finding of intentional discrimination. Whether intentional discrimination has occurred is exactly the issue here.[1] For these reasons, Mullen's reliance on these cases is misplaced.

---

1. Even under the standard Mullen advocates, we cannot say that the record in this case mandates a finding that the company has engaged in a pattern of discrimination. Mullen presented general evidence of an atmosphere of racial tension in the town, and of a general reputation for racial hostility on the part of the fire company. It is also true that no black person had been a member of the company in the past. Mullen did not, however, present any specific evidence that other blacks had applied and been rejected. Rather, he produced general testimony from two persons who had years earlier asked for applications, but never pursued membership. Mullen's evidence thus differs from

that traditionally used to show a pattern or practice of intentional discrimination. *Cf. Teamsters,* 431 U.S. at 338, 97 S.Ct. at 1856 (forty individual instances of discrimination in addition to statistical evidence); *Chisholm v. United States Postal Service,* 665 F.2d 482, 495 (4th Cir.1981) (testimony of twenty class members in addition to statistical evidence). It is clear that "proving isolated or sporadic discriminatory acts by the employer is insufficient to establish a prima facie case of a pattern or practice of discrimination." *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 875–76, 104 S.Ct. 2794, 2799–2800, 81 L.Ed.2d 718 (1984).

■ In his third challenge to the district court's instructions, Mullen contends that the evidence of the decisionmakers' use of racial epithets which should have been admitted calls for a shift in the burden of persuasion. He argues that the slurs constitute direct evidence of discriminatory intent, and that where a plaintiff presents direct evidence of discriminatory intent that is believed by the factfinder the burden shifts to the defendant to show by a preponderance of the evidence that the same decision would have been reached absent the improper motive. Several circuit courts have advocated such a proof scheme in opinions reviewing Title VII bench trials. *See, e.g., Hopkins v. Price Waterhouse*, 825 F.2d 458, 470–471 (D.C. Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1106, 99 L.Ed.2d 268 (1988); *Fields v. Clark University*, 817 F.2d 931 (1st Cir. 1987); *Bibbs v. Block*, 778 F.2d 1318 (8th Cir.1985) (en banc); *Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir.1985).

Mullen's argument suffers from the same flaw that we have earlier discussed: it would inject needless complexity and potential confusion where simplicity is far more appropriate. Again we emphasize that in a jury trial where intentional discrimination must be proved, the best instruction for the jury is a straightforward explanation that the plaintiff must prove by a preponderance of the evidence that he was rejected because of his race. *See Nelson*, 788 F.2d at 207. The standard Mullen advocates would mire the court in the semantics of determining what evidence of discrimination is "direct" and what "indirect" or "circumstantial," and impose a further layer of complexity on the already confusing scheme of shifting burdens.

The Supreme Court has not suggested such an alteration of the well-established *Burdine* proof scheme, which was specifi-cally developed for the employment discrimination context. In *Aikens*, for example, the Court noted that the plaintiff had introduced testimony that "the person responsible for the promotion decisions at issue had made numerous derogatory comments about blacks in general and Aikens in particular." 460 U.S. at 713–14 n. 2, 103 S.Ct. at 1480–81 n. 2. Yet the Court reiterated the applicability of the *Burdine* scheme in ordering the presentation of proof, and emphasized that the basic factual inquiry is "whether the defendant intentionally discriminated against the plaintiff." *Id.* at 715, 103 S.Ct. at 1482.[2] Similarly, this court has employed the *Burdine* analysis whether a plaintiff brings direct or indirect proof of his claim of discrimination. *See Abasiekong*, 744 F.2d at 1058 (burden of persuasion remained with plaintiff who introduced evidence of racial slurs directed at him by decisionmaker). Of course, direct evidence of discrimination makes it more likely that the jury will find for plaintiff. Whether the plaintiff attempts to prove intentional discrimination by direct or indirect evidence, the "burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

## B.

■ Mullen's last contention is that the district court erred in not granting injunctive relief despite the fact that the jury found for the company on his discrimination claim. Specifically, Mullen requested that the district court impose specific recruitment goals, record-keeping requirements, reporting requirements, inspection rights for Mullen's attorneys, and that the court retain jurisdiction for five years for

**2.** Mullen correctly quotes *TWA, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985), as stating that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." That case, however, involved an employment policy based on age which was "discriminatory on its face," not mere evidence tending to indicate a discriminatory motive. Unlike this case, it was not disputed that the employer had discriminated. The *Thurston* case turned on whether the discrimination was permissible under affirmative defenses provided by the Age Discrimination in Employment Act, and the quoted reference merely established that the defendant could not rely on a deficiency in the *Burdine* prima facie case to avoid being subject to the ADEA's standards.

the purpose of monitoring the company. Mullen argues that he has shown a pattern of racial discrimination, and that where such a pattern is shown, the district court must enter injunctive relief despite the failure of the plaintiff's individual claim of discrimination. The district court denied injunctive relief on the grounds that Mullen had failed to prove a pattern of discrimination, and that injunctive relief was improper because Mullen would not in any event have benefited from the relief. *See Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1136 (11th Cir.1984). Equitable relief is a discretionary remedy, and the district court did not abuse its discretion in denying Mullen's request.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.