28 F.3d 1211
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John Maurice HENOUD, a/k/a Jeffrey Berg, Jr., a/k/a Jerry M.
Davidson, a/k/a Gerry G. Davidson, a/k/a Gerry Davidson,
a/k/a J.D. Chapman, aka Jay Chapman, a/k/a Alex Reyes, a/k/a
Jerry Davis, a/k/a V.J. Gupta, a/k/a Jerry G. Davidson,
Defendant-Appellant.
 No. 93-5418.
 United States Court of Appeals, Fourth Circuit.
 Argued April 14, 1994.
Decided July 15, 1994.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. J. Calvitt Clarke, Jr., Senior District Judge. (CR-92-183-N)
 Argued Lloyd Foster Sammons, Sammons & Smith, Alexandria, VA, for appellant.
 George Maralan Kelley, III, Asst. U.S. Atty., Norfolk, VA, for appellee.
 On Brief Helen F. Fahey, U.S. Atty., Norfolk, VA, for appellee.
 E.D.Va.
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 Before WIDENER and WILLIAMS, Circuit Judges, and TURK, United States District Judge for the Western District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 John Maurice Henoud[1] appeals his convictions for conspiracy to defraud, in violation of 18 U.S.C. Sec. 371 (1988), fraud in connection with access devices, in violation of 18 U.S.C.A. Sec. 1029(a)(2) (West Supp.1994), and twelve counts of wire fraud, in violation of 18 U.S.C.A. Sec. 1343 (West Supp.1994). The district court sentenced him to a consolidated fifty-seven month term of imprisonment and imposed restitution in the amount of $24,338.23. Henoud raises several allegations of reversible error, including admission of evidence ruled inadmissible at a pretrial hearing, ineffective assistance of counsel, sufficiency of the evidence to sustain the convictions, absence of factual findings required for the imposition of restitution, and assessment of the "organizer or leader" sentencing enhancement.[2] Finding no error, we affirm Henoud's convictions and sentence. However, because the record reveals three conflicting total loss figures resulting from Henoud's activities, we vacate the restitution portion of the final judgment and remand for further proceedings to determine the actual amount of restitution owed.
 
 I.
 
 2
 Henoud was convicted of defrauding several American long-distance telephone companies by establishing and operating a call-sell fraud scheme or "Amigo scam."[3] His scheme operated out of Suite 204, 405 South Parliament Drive, Virginia Beach, Virginia (the "Parliament Drive" location), between September 16 and 25, 1992. Henoud surreptitiously leased Suites 204 and 207 at the Parliament Drive location through two unknown individuals who identified themselves to the owner of the suites as Jerry Davis and Alex Reyes. He then obtained telephone service in those offices with fictitious Social Security numbers, business names, and contact telephone numbers. Using five phone lines, he established and maintained multi-hour "trunk lines" to Turkey, Cyprus, and Lebanon which allowed him to connect calls from those countries to any country in the world. On September 22, 1992, alone, one line was connected to a single Turkish number for twelve hours and fourteen minutes in a fourteen-hour span, and three of the lines were connected for a total of forty-seven hours. Henoud never paid the service installation or toll charges incurred at the Parliament Drive location, resulting in a stipulated total loss to five American phone companies--AT & T, Sprint, Metro Media, Allnet, and Chesapeake and Potomac Telephone Company (C & P)--of $24,442.53. However, there was no evidence of a bill for those expenses being issued before his September 25, 1992, arrest.
 
 
 3
 Although Henoud had not yet defaulted on expenses incurred at the Parliament Drive location, Secret Service agents suspected criminal conduct based on similar incidents, involving Henoud and an identical modus operandi, between September 2 and 8, 1992, at 3707 Virginia Beach Boulevard in Virginia Beach (the "Virginia Beach Boulevard" location), and during the 1992 Fourth of July weekend in Forrestville, Maryland (the "Forrestville" location), both of which resulted in thousands of dollars in unpaid toll charges. A search warrant for the sparsely-furnished Parliament Drive location yielded a folding table containing five telephones, a napkin and various notepads containing numbers that corresponded to phone numbers on that location's toll records, and steno pads with numbers that corresponded to the temporal duration of calls on those toll records. The phones, each with its own number, were connected to a single "junction box"; foreign language conversations were being conducted on those phone lines at the time of the search. Incident to his arrest, Henoud's person and his car were consensually searched, revealing various items linking him with the Virginia Beach Boulevard location and Suites 204 and 207 of the Parliament location.[4] In addition to the items recovered in those searches, the Government's evidence at trial included the testimony of Michael Washington, who had been arrested at the Parliament Drive location with Henoud.[5] Washington testified that Henoud had invited him to Virginia Beach to "answer phones." (J.A. at 462.) Upon arrival in Virginia Beach, they went to the house of Gene Gibson. Gibson gave Henoud a canvas bag, subsequently identified by Washington as the bag discovered in Henoud's car, which contained the phones, tools, and wiring used in Suite 204. After setting up the phones at the Parliament Drive location, Henoud, speaking in a foreign language, began a four-day marathon of making and receiving calls to and from persons also speaking in foreign languages, noting the duration of each call on the legal pads, and calculating his forthcoming profits on the steno pad. Washington's inability to speak a foreign language precluded him from working the phones and resulted in his relegation to running errands and retrieving food for Henoud. Henoud indicated to Washington his intent to move the operation to Suite 207 the following week because he did not want anyone to know the location of his business.
 
 
 4
 Other evidence included the testimony of Paul Weber, the tenant at the Forrestville location who sublet an office to Henoud. Weber testified that he had once discovered Henoud and a person identified only as "Eli" using six phone lines, installed without Weber's permission in an area not part of the subleased space, conducting long-distance calls in foreign languages and writing numbers on legal pads. Henoud abandoned that location soon thereafter without paying rent and took the phones with him.
 
 
 5
 Secret Service Special Agent Robert Degen also testified that Amigo scams target countries where telephonic contact with certain other countries is prohibited by legal or communication technology limitations, or where the scams can successfully undercut the prices charged for comparable, available services by the foreign country's telephone company. According to Agent Degen, when the phone calls are not otherwise prohibited, Amigo scam perpetrators profit only if the United States-based operator avoids domestic phone charges. Other testimony and documentary evidence established that Gene Gibson was the tenant named in the lease for the Virginia Beach Boulevard location, and that certain phone calls to foreign locations on the Parliament Drive toll records corresponded to numbers on the unpaid toll records for the Virginia Beach Boulevard and Forrestville locations and to numbers used in prior, unrelated Amigo scams investigated by the Secret Service.
 
 
 6
 In defense, Henoud argued that the toll charges at the Parliament Drive location were legitimately incurred as a result of the daily operations of his business, Creative Purchasing, a computerized service that used his foreign contacts to sell used automobiles abroad, particularly in the Middle East. Henoud also testified that he intended to pay the toll charges at the Parliament Drive location upon receipt of the bill. He explained his connection with Gibson and the Virginia Beach Boulevard location by describing Gibson as a licensee of his computer software, and testified that he had earlier attempted unsuccessfully to start a similar business at the Forrestville location. Henoud made no attempts to explain the connection with Suite 207 at the Parliament Drive location or the multi-hour trunk lines to Cyprus, Turkey, and Lebanon.
 
 II.
 
 7
 On appeal, Henoud first contends that the district court erroneously admitted evidence at trial that had been previously ruled inadmissible. The district court's pretrial order excluded evidence concerning the Forrestville incident and use of the term "Amigo scam," finding that the probative value thereof was likely outweighed by the danger of unfair prejudice, see Fed.R.Evid. 403, but expressly reserved the right to reconsider those rulings for rebuttal purposes or for some other compelling reason. At trial, the court found that Henoud's aggressive defense, which targeted the absence of a telephone bill for the Parliament Drive location toll charges before his arrest and, hence, proof of an intent to defraud, "opened the door" to the admission of evidence pertaining to the Forrestville incident and the similarities between Henoud's conduct and the pattern of criminal activity recognized by Secret Service agents as an "Amigo scam." Henoud asserts that this ruling constitutes reversible error.
 
 
 8
 Although the district court initially ruled that this evidence would not be admissible, it specifically retained the discretion to reconsider the probative value versus unfair prejudice evaluation in light of trial strategy and the other evidence proffered at trial. Our task then is to review the actual admission of the evidence for abuse of discretion, keeping in mind that the admission of evidence is "peculiarly within the province of the district court." Martin v. Deiriggi, 985 F.2d 129, 137 (4th Cir.1992).
 
 
 9
 We find that the evidence in question, of which Henoud had ample notice in advance of trial, was properly admitted under Fed.R.Evid. 404(b) because it was "(1) relevant to an issue other than character, (2) necessary, and (3) reliable," United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988) (footnotes omitted), and because it was more probative than prejudicial under Rule 403. The evidence bore directly on Henoud's intent to commit the offenses, an issue expressly contemplated by Rule 404(b). The offenses of wire fraud and fraud in connection with access devices, with which Henoud was charged, both require proof of a specific fraudulent intent, thereby automatically placing Henoud's intent into issue. See United States v. Schweihs, 971 F.2d 1302, 1311 (7th Cir.1992). Henoud magnified the relevancy of this evidence on the issue of intent by pleading not guilty, United States v. Mark, 943 F.2d 444, 448 (4th Cir.1991), and by proffering a defense of legitimate business dealings for the telephone calls and absence of intent to avoid payment of the toll charges. See United States v. Wrice, 954 F.2d 406, 412 (6th Cir.) (defendant's denial of ownership of drugs opened the door to extrinsic evidence of ownership and intent to distribute), cert. denied, 112 S.Ct. 2286 (1992).
 
 
 10
 The evidence was also necessary in that it pertained to "an essential part of the crimes on trial." Mark, 943 F.2d at 448. Our review of the record reveals no mention of bills issued prior to Henoud's arrest for toll charges incurred at either the Parliament Drive or the Virginia Beach Boulevard locations. Indeed, in everyday experience, it is rare that a phone company issues a bill for toll charges incurred during a particular month prior to the expiration of that month. Therefore, the only available affirmative evidence of an unpaid phone bill issued before Henoud's arrest and, presumably, of the essential element of an intent to avoid payment, stemmed from the unpaid July toll charges incurred at the Forrestville location. Use of the "Amigo scam" term was relevant and necessary, in that the description of that type of scheme, and the comparison of it with Henoud's acts, was a valid method of testing the credibility of Henoud's proffered defense. See United States v. Brainard, 745 F.2d 320, 323 (4th Cir.1984), cert. denied, 471 U.S. 1099 (1985). Finally, Henoud has not contested, and we find no reason to question, the reliability of the evidence pertaining to the Forrestville incident and the Amigo scam. Because of the similarities between the Forrestville and Parliament Drive incidents, "there can be little doubt that they are both relevant and necessary to the government's effort to demonstrate that [Henoud] had the necessary specific intent" to defraud the long-distance companies. United States v. McLamb, 985 F.2d 1284, 1289 (4th Cir.1993); see also United States v. Haney, 914 F.2d 602, 607 (4th Cir.1990) (evidence of string of identical criminal offenses committed in the same manner admissible under Rule 404(b)).
 
 
 11
 The last inquiry for admissibility, the Rule 403 weighing of the probative value of the evidence against its prejudicial effect, also supports the district court's ruling. Although incriminating, see Haney, 914 F.2d at 607 (merely incriminating evidence not enough to warrant exclusion under Rule 403), the evidence presented no opportunity for unfair prejudice because it lacked the potential to "excite the jury to make a decision on the basis of a factor unrelated to the issues properly before it." United States v. Simpson, 910 F.2d 154, 158 (4th Cir.1990) (quoting Mullen v. Princess Anne Volunteer Fire Co., 853 F.2d 1130, 1134 (4th Cir.1988)). Because the evidence in question was indeed properly admissible under Rule 404(b) and Rule 403, we find no abuse of discretion in the district court's reconsideration of its pretrial evidentiary ruling.[6]
 
 III.
 
 12
 Next, Henoud argues that his convictions should be reversed because of several instances of ineffective assistance of counsel, including defense counsel's opening the door to the Forrestville incident and use of the term "Amigo scam," and counsel's failure to limit references to Henoud as Middle Eastern, to seek dismissal of the indictment, and to challenge the search of his car.
 
 IV.
 
 13
 A claim of ineffective assistance of counsel should be asserted in the district court by motion under 28 U.S.C. Sec. 2255 (1988), and not on direct appeal, unless it "conclusively appears" from the record that defense counsel indeed failed to render effective assistance. United States v. Fisher, 477 F.2d 300, 302 (4th Cir.1973); see also United States v. DeFusco, 949 F.2d 114, 120-21 (4th Cir.1991), cert. denied, 112 S.Ct. 1703 (1992). The record in this case does not conclusively establish the objective unreasonableness of counsel's actions or a reasonable probability that the result would have been different but for counsel's conduct. See Strickland v. Washington, 466 U.S. 668, 687-91, 694 (1984). Hence, we decline to review this issue at this time.
 
 IV.
 
 14
 Henoud's next argument presents a tripartite assault on the sufficiency of the evidence to support his various convictions. He first asserts the invalidity of the Sec. 371 conspiracy conviction in light of the Government's failure to identify a coconspirator. Henoud also attacks the Sec. 1029(a)(2) conviction for the purported dearth of evidence of illegal use of an access device. Finally, he contests the sufficiency of the evidence on the issue of intent to defraud for purposes of the Sec. 1343 wire fraud convictions.
 
 
 15
 In reviewing these challenges, we are required to determine whether, taking the evidence in the light most favorable to the Government and giving the Government the benefit of all reasonable inferences, "any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." United States v. United Medical & Surgical Supply Corp., 989 F.2d 1390, 1402 (4th Cir.1993). We may neither weigh evidence nor review witness credibility. United States v. Saunders, 886 F.2d 56, 60 (4th Cir.1989). Reversals for insufficiency of the evidence are " 'confined to cases where the prosecution's failure is clear.' " United States v. Jones, 735 F.2d 785, 791 (4th Cir.) (quoting Burks v. United States, 437 U.S. 1, 17 (1978)), cert. denied, 469 U.S. 918, 936 (1984).
 
 A.
 
 16
 To demonstrate the existence of a conspiracy involving Henoud that violates Sec. 371, the Government must show at least one other person who knew of and shared, even tacitly, Henoud's intent to avoid domestic toll charges and, thereby, to defraud American phone companies. See United States v. Chorman, 910 F.2d 102, 109 (4th Cir.1990). This need not be proven by direct evidence, United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991), and "may be inferred from the facts and circumstances of the case." United States v. Baker, 985 F.2d 1248, 1255 (4th Cir.1993), cert. denied, 114 S.Ct. 682 (1994).
 
 
 17
 We find sufficient evidence to support a reasonable conclusion that Gene Gibson and the unnamed telephone operators in Turkey, Cyprus, and Lebanon were Henoud's coconspirators.[7] Gibson was the tenant named in the Virginia Beach Boulevard location lease. The office door of that location bore the company name "Auto Link of Tidewater," the same company name on the fliers and business cards discovered in Henoud's car for which Henoud "worked" as Jerry Davidson. Unpaid toll charges amounting to approximately $28,000 were accumulated at the Virginia Beach Boulevard location on phone lines corresponding to phone numbers inscribed on junction boxes also located in Henoud's car. Certain identical foreign phone numbers also appeared on the toll records for both the Parliament Drive and Virginia Beach Boulevard locations. Finally, Washington testified that Gibson provided the phones, wiring, and tools used to perpetrate the Parliament Drive scam in a canvas bag later seized from Henoud's car. The operation of a complicated criminal enterprise out of Gibson's leased property, combined with his participatory role in providing the equipment necessary for the perpetuation of a similar enterprise out of another location, belies any possible argument that Gibson was unaware of the criminal intent underlying Henoud's activities. At a minimum, these facts would support a reasonable inference that Gibson was "aware of a high probability of the existence of the fact in question [i.e., the intent to avoid payment of the toll charges] and purposefully contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution," thereby making him criminally liable as a coconspirator under a theory of deliberate ignorance or willful blindness. United States v. Rivera, 944 F.2d 1563, 1571 (11th Cir.1991) (footnote omitted) (quoting United States v. Alvarado, 838 F.2d 311, 314 (9th Cir.1987), cert. denied, 487 U.S. 1222 (1988)); see also United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1195 (2d Cir.), cert. denied, 493 U.S. 933 (1989).
 
 
 18
 Furthermore, " 'a person can be convicted of conspiring with persons whose names are unknown as long as the indictment asserts that such other persons exist and the evidence supports their existence [and complicity].' " United States v. Price, 869 F.2d 801, 804 (5th Cir.1989) (quoting United States v. Klein, 560 F.2d 1236, 1242 (5th Cir.1977), cert. denied, 434 U.S. 1073 (1978)). Hence, Special Agent Degen's testimony concerning the profit structure of Amigo scams supports a reasonable inference that the foreign phone operators also knew the scam's proceeds and, in turn, their profits depended upon eliminating overhead expenses by avoiding American toll charges. The circumstances of this case indicate that Henoud and the foreign operators "acted in concert to achieve an illegal goal." United States v. Bell, 954 F.2d 232, 236 (4th Cir.1992) (quoting United States v. Laughman, 618 F.2d 1067, 1074 (4th Cir.1980)), cert. denied, 114 S.Ct. 112 (1993). Henoud's proffered defense that these phone calls concerned international used car sales was obviously rejected by the jury. We shall not disturb their acceptance of the Government's conspiracy account as the proper interpretation of the evidence. See United States v. Hines, 717 F.2d 1481, 1491 (4th Cir.1983), cert. denied, 467 U.S. 1214, 1219 (1984).
 
 B.
 
 19
 We also reject Henoud's sufficiency challenge as to the Sec. 1029(a)(2) conviction. It is a crime underSec. 1029(a)(2) to obtain anything of value exceeding $1,000 by "knowingly and with intent to defraud traffic[king] or us[ing] one or more unauthorized access devices during any one-year period." The indictment in this case charged that Henoud's use of Sprint telephone access codes violated Sec. 1029(a)(2). Henoud contends that those codes were properly used because they were in the public domain.
 
 
 20
 However, even if the Sprint access codes used were in the public domain, Henoud's acquisition and use thereof was rendered "unauthorized," and therefore violative of Sec. 1029(a)(2), by his accompanying intent to defraud the long-distance companies, 18 U.S.C.A. Sec. 1029(e)(3) (West Supp.1994), as evidenced by his pattern of incurring and avoiding payment of toll charges. The use of a readily-obtainable access device does not implicitly authorize, and thereby excuse, the avoidance of toll charges credited to that device.
 
 C.
 
 21
 We also reject Henoud's sufficiency of the evidence challenge to the wire fraud convictions. Section 1343 prohibits the use of wire, radio, or television communications in furtherance of a fraudulent scheme to obtain money or property. According to Henoud, the Government's evidence lacked any proof of the essential fraudulent intent element.
 
 
 22
 Our review of the record reveals ample evidence of an Amigo scam operated by Henoud, similar to those he had previously operated at the Virginia Beach Boulevard and Forrestville locations, at the Parliament Drive location with the intent to profit by defrauding long-distance companies of their lawful revenues, through the use of telephone trunk lines without accompanying remuneration. See United States v. Loney, 959 F.2d 1332, 1336-37 (5th Cir.1992) (defrauding a company of its lawful revenues is actionable underSec. 1343). "It need not be shown that the intended victim of the fraud was actually harmed; it is enough to show [Henoud] contemplated doing actual harm, that is, something more than merely deceiving the victim." Id. at 1337 (quoting United States v. Schwartz, 924 F.2d 410, 420 (2d Cir.1991)). In this regard, as with Henoud's other evidentiary contentions, we find the evidence sufficient and decline to disturb the convictions.
 
 V.
 
 23
 Henoud also raises two challenges to the sentence imposed by the district court. Henoud first contends that the sentencing court failed to comply with its statutory duty to "consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C.A.Sec. 3664(a) (West Supp.1994). Henoud also contests the court's assessment of the "organizer or leader" enhancement, United States Sentencing Commission, Sentencing Guidelines, Sec. 3B1.1(a) (Nov.1992), due to a purported lack of evidence that he actually organized or led the participants.
 
 A.
 
 24
 It is true that this court requires factual findings as to the Sec. 3664(a) factors that "key a defendant's financial resources, financial needs, and earning ability to the type and amount of restitution." United States v. Molen, 9 F.3d 1084, 1086 (4th Cir.1993), cert. denied, 62 U.S.L.W. 3722 (U.S.1994). We find that the court satisfied that requirement in this case by "adopting a presentence report that recites adequate recommended factual findings." Id.
 
 
 25
 According to his presentence report, Henoud is trilingual (English, French, and Arabic), has an Associate Degree in international business law, and has an extensive work history in automobile and computer sales and marketing (typically in managerial positions), with annual salaries ranging from $40,000 to $72,000. The restitution ordered is well within Henoud's future earning potential. His present negative net monthly cash flow reflects a temporary set-back attributable to short-term financial hardships caused by the start of his own apparently unsuccessful company sixteen months prior to the Forrestville incident.
 
 
 26
 At sentencing, Henoud acknowledged his liability for the toll charges incurred at the Parliament Drive location, stated that he intended to pay those charges, and stipulated to the amount of that loss. See Hughey v. United States, 495 U.S. 411, 412 (1990) (restitution may be ordered only for offense of conviction). Moreover, Henoud did not challenge the presentence report's proposed findings as to his finances with contrary evidence, as required by Sec. 3664(d). See United States v. Terry, 916 F.2d 157, 162 (4th Cir.1990) (defendant has "affirmative duty" to show unreliability or inaccuracy of information in presentence report). Those unchallenged recommended findings are neither incomplete nor unclear, and are therefore not subject to attack here. Molen, 9 F.3d at 1087; see, e.g., United States v. Saucedo, 950 F.2d 1508, 1518 (10th Cir.1991) (failure to object to factual inaccuracies in presentence report constitutes waiver of the issue on appeal), cert. denied, 113 S.Ct. 1343 (1993). The court's adoption of Henoud's presentence report provided an adequate factual basis for the imposition of restitution in this case.
 
 
 27
 However, we are concerned about the three conflicting accounts of the exact losses resulting from the Parliament Drive incident. At trial, Mary Coulsting, a security supervisor for Bell Atlantic Corporation, testified that the total long-distance bill for the Parliament Drive location was $24,442.53, of which $10,087.81 was owed to AT & T, $8,958.58 to Sprint, $4,069.08 to Metro Media, $249.13 to Allnet, and the remaining $1,077.93 to C & P. (J.A. at 355-56.) At sentencing, the court accepted Henoud's stipulation to an identical total loss amount. (J.A. at 1081-82, 1141.) However, Coulsting's testimony at sentencing established different loss amounts to AT & T ($10,392.82), Sprint ($8,959.58), and C & P ($667.62), resulting in a discrepancy of $104.30 and a second total loss calculation of $24,338.23. (J.A. at 1128.) In pronouncing final judgment, the district court ordered restitution to the five long-distance companies in amounts equal to Coulsting's sentencing testimony, but reduced for no apparent reason the amount owed to Allnet by $20.00, to $229.13, thereby yielding a third total loss calculation of $24,318.23. (J.A. at 1268.) However, the final written judgment eliminated the unexplained $20 reduction, again without reason, and ordered restitution in the amounts testified to by Coulsting at sentencing. (J.A. at 1275.) Although the district court's Sec. 3664(a) findings pertaining to Henoud's financial profile are adequate to support an award of restitution, the amounts discussed herein are impermissibly inconsistent. Therefore, we vacate the restitution order and remand that portion of the final judgment for a determination of the restitution amount actually owed.
 
 B.
 
 28
 To qualify for the Sec. 3B1.1 organizer or leader enhancement, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. Sec. 3B1.1, comment. (n.2) (emphasis added). Our review of the record, in light of the factors set forth in U.S.S.G. Sec. 3B1.1, comment. (n.3), reveals ample evidence demonstrating Henoud's position of control in this enterprise. He set up, conducted, and oversaw the operations at the Parliament Drive location, see United States v. Chambers, 985 F.2d 1263, 1267-68 (4th Cir.), cert. denied, 114 S.Ct. 107 (1993); recruited and exercised control over Washington, see United States v. Kincaid, 964 F.2d 325, 329 (4th Cir.1992); United States v. Smith, 914 F.2d 565, 570 (4th Cir.1990), cert. denied, 498 U.S. 1101 (1991); coordinated the rental by "Davis" and "Reyes" of Suites 204 and 207 at the Parliament Drive location, as evidenced by his occupation of the premises and possession of the leases and receipts; and financed both the Virginia Beach Boulevard and Forrestville operations. The record also shows that Henoud had the Middle Eastern contacts needed to establish and carry out this scheme. See United States v. Richardson, 939 F.2d 135, 140 (4th Cir.) (evidence of defendant's contacts with others necessary for the success of the criminal enterprise relevant for Sec. 3B1.1 enhancement), cert. denied, 112 S.Ct. 599 (1991), and cert. denied, 112 S.Ct. 942 (1992). Given this evidence and the due deference accorded a district court's application of the Guidelines to the facts of a case, 18 U.S.C.A. Sec. 3742(e) (West Supp.1994), we find no clear error in the assessment of the Sec. 3B1.1(a) enhancement. See United States v. Harriott, 976 F.2d 198, 202 (4th Cir.1992) (standard of review).
 
 VI.
 
 29
 For the reasons stated herein, we affirm all aspects of Henoud's convictions and sentence except the order of restitution. We vacate that order and remand for further proceedings consistent with this opinion.
 
 
 30
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 [1]
 Henoud identified himself to arresting officers as Jerry G. Davidson, and later secured a personal recognizance bond release on the basis of that representation. A subsequent check of Federal Bureau of Investigation fingerprint records revealed his true identity
 
 
 [2]
 Henoud's brief refers to two additional issues, identified as Issues VIII and IX--"whether the court erred in admitting evidence and properly charged defendant under 18 U.S.C. Sec. 371," and "whether the defendant's consent to search his automobile applied to the entire automobile or just to items defendant identified to law enforcement agents," respectively--which were "included at [the] request of defendant." Appellant's Brief at 2. However, there is no accompanying discussion of these issues in Henoud's brief. To the extent that Henoud has not abandoned those issues by failing to address them in his brief in accordance with Fed. R.App. P. 28(a)(5), see Bender v. Brumley, 1 F.3d 271, 275 (5th Cir.1993); 16 Charles A. Wright et al., Federal Practice and Procedure, Sec. 3974 (1977 & Supp.1993), we find that they are without merit and do not constitute reversible error
 
 
 [3]
 This type of scam, named for the original perpetrator, Frank Amigo, see United States v. Amigo, No. 91-2850 (5th Cir. Aug. 6, 1992) (unpublished), began in the late 1980s, when the government of Israel forbade direct telephone communications between Israel and other Middle Eastern countries. Amigo began an enterprise that connected pre-arranged call sites in Israel with parties in other Middle Eastern countries by way of conference calls initiated and operated in the United States. When the Israeli government dropped its prohibition, Amigo had to undercut the long distance rates charged by the government-owned phone companies in order to make a profit. In addition to undercutting those long distance rates, Henoud illegally evaded payment to American phone companies. He defrauded the American phone companies by securing phone service at a temporary location, incurring large bills, and then abandoning the location and service without payment
 
 
 [4]
 The search of Henoud's person yielded (1) two business cards identifying Jerry Davidson as being associated with Auto Link and containing French and German telephone numbers that corresponded with numbers in the toll records for the Virginia Beach Boulevard location, (2) U.S. Sprint and MCI credits cards issued to Auto Link, (3) a business card of the owner of the Parliament Drive suites with a handwritten notation reflecting receipt of $400 from Jerry Davis for the rental of Suite 204, and (4) a Virginia driver's license for Jerry Davidson
 The search of Henoud's car yielded (1) two more junction boxes bearing telephone numbers previously installed and used at the Virginia Beach Boulevard location, (2) leases for Suites 204 and 207 of the Parliament Drive location showing Davis and Keyes as the respective tenants, (3) a C & P Telephone letter to a Jeffrey Berg at Suite 204 thanking him for the phone service order, (4) a canvas bag containing various tools and wires, and (5) fliers marked "Auto Link of Tidewater," the company name on the door of the Virginia Beach Boulevard location.
 
 
 [5]
 Washington was originally indicted as a coconspirator, but charges were subsequently dropped when he agreed to testify against Henoud
 
 
 [6]
 Henoud devotes an entire section of his appellate brief to the question whether the erroneous admission of this evidence can be considered harmless. Our finding that there was no error in admitting this evidence obviates the need for a harmless error analysis. United States v. Hudson, 884 F.2d 1016, 1018 n. 1 (7th Cir.1989), cert. denied, 496 U.S. 939 (1990)
 
 
 [7]
 We agree with Henoud that Washington cannot properly be considered a coconspirator. Washington's testimony that he did not know of Henoud's intent to avoid payment of toll charges precluded proof of a "meeting of the minds" between Henoud and Washington as to the specific fraudulent intent underlying the scheme. The general illegal conduct implied by Henoud's statement to Washington that he intended to keep the location of the business secret would not necessarily alert Washington to the specific criminal intent required for the fraudulent scheme contemplated by Henoud