Mary M. LOVE, Appellant,

v.

The ALAMANCE COUNTY BOARD OF EDUCATION, Appellee.

No. 84–1326.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1984.

Decided March 27, 1985.

I.

Jonathan Wallas, Charlotte, N.C. (J. Le-Vonne Chambers, Chambers, Ferguson, Watt, Wallas & Adkins, P.A., Charlotte, N.C., on brief), for appellant.

Michael A. Gilles, Greensboro, N.C. (Martin N. Erwin, Smith, Moore, Smith, Schell & Hunter, Greensboro, N.C., Paul H. Ridge, Daniel S. Johnson, Ridge, Richardson & Johnson, Graham, N.C., on brief), for appellee.

Before SPROUSE and CHAPMAN, Circuit Judges, and DUPREE, United States District Judge for the Eastern District of North Carolina, sitting by designation.

SPROUSE, Circuit Judge.

Mary Love, a black female, appeals from a judgment of the district court, 581 F.Supp. 1079, entered in favor of defendant Alamance County, North Carolina, Board of Education in this action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) (1982), and 42 U.S.C. §§ 1981, 1983 (1982). The district court held that the Board did not discriminate on the basis of race or sex when it refused on several occasions to promote Love to a position as principal or assistant principal. On appeal Love raises two major arguments: (1) the district court erred in failing to apply strict scrutiny to the Board's articulated reason for not promoting her; and (2) the district court erred in evaluating her claim under the principles enunciated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Love also claims that the district court's finding that she withdrew her application for a certain position is clearly erroneous. For the reasons stated below, we affirm the judgment of the district court.

Love is a black female who began her employment as an elementary school teacher in the Alamance County school system in 1957. Prior to her employment in the system, she received a B.A. degree from Winston-Salem State University in North Carolina in 1955, and taught briefly in various school systems. In 1959 she received a M.A. degree in elementary education from North Carolina Central University.

The Alamance County school system was segregated until the late 1960's. Beginning with the 1969–70 school year, Love transferred to integrated schools and taught reading at E.M. Yoder and South Mebane Elementary schools. At that time she took summer courses at the University of North Carolina at Chapel Hill but received no degree. Beginning with the 1971–72 school year, she was placed permanently as a reading teacher at South Mebane Elementary School. At this time Love began taking courses in school administration at North Carolina A & T University and received a principal certification, grades K–12, from the North Carolina Department of Public Instruction in May 1972. Prior to receiving the certification, she served as an intern at South Mebane Elementary School. From 1972 until 1976 Love took some education courses in reading at the University of North Carolina at Greensboro in order to acquire certification in reading, but since 1972 she has acquired a total only of six credit hours of non-in-service education courses.

Love's work performance as a teacher has been evaluated regularly while in the Alamance system, and through 1977 her evaluations, completed by a number of different principals, were uniformly "satisfactory"—the highest rating permissible on the standardized evaluation forms. Comments included "a real asset to our program," "very resourceful," and "cooperative," and students enjoyed her classes, which were "well planned." Love also was the coordinator of student teaching during the 1974–75 school year. In her June 1975 evaluation, she was given a top rating of

"satisfactory" in all categories except punctuality. The evaluator, assistant superintendent of personnel, stated that Love "has continued to grow professionally," that her contributions were "greatly appreciated," and that she had done "a very good job."

Starting in 1978, the standardized evaluation forms included a higher rating—"commendable." In 1978 she was rated "commendable" in seven categories, "satisfactory" in twenty categories, and "marginal" in one category (punctuality). In 1979 she was rated "commendable" in thirteen categories and "satisfactory" in the other fifteen categories.

Love filed a charge of discrimination on October 27, 1978 with the Equal Employment Opportunity Commission (EEOC) alleging that she had been denied promotions because of her race and sex. The EEOC issued to Love a notice of her right to sue, and she timely instituted this lawsuit under Title VII and sections 1981 and 1983 on June 22, 1979.

At trial, Love introduced evidence of at least fifteen rejections for administrative positions in the Alamance school system since 1970. The district court limited its consideration of her claims under Title VII to discriminatory acts occurring after April 30, 1978, that is, within 180 days of her filing her charge with the EEOC [1] and limited its consideration of her claims under sections 1981 and 1983 to discriminatory acts occurring after June 22, 1976, that is, acts occurring within North Carolina's three year statute of limitations.[2] Under these time limitations, the court considered her evidence pertaining only to eight rejections for administrative positions and, finding no discrimination, decided all eight in favor of the Alamance County Board of Education. Love appeals the district court's findings as to only three of the positions she sought: principal at B. Everett Jordan Elementary School in 1977 and again in 1978; and assistant principal at Western Middle School in 1980. These positions were all awarded to whites: Jane Burke, Willis Wheeler, and Ronald Bozeman, respectively.

## II.

In evaluating Love's claims, the district court applied the principles for shifting the burden of proof announced in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The district court first found that Love established a prima facie case by showing that she belonged to a protected class (black female), that she applied for a position for which she was qualified, that she was rejected, and that a white was chosen to fill the position. The district court next found that the Board articulated a legitimate, non-discriminatory reason for not promoting Love into the administrative positions in question—namely, that she was less qualified than the persons chosen. In the third stage of the analysis, the district court found that Love failed to prove that the Board's articulated reasons were pretextual.

Love contends, however, that because the evaluators used subjective criteria in their selection procedures, the legitimacy of and non-discriminatory basis for the Board's decision should be subject to strict scrutiny and that under strict scrutiny, the Board's articulated reason fails to rebut her prima facie case. While we agree with Love that the Board's articulated reason should be subject to strict scrutiny, *Page v. Bolger*, 645 F.2d 227, 230 (4th Cir.) (en banc), *cert. denied*, 454 U.S. 892,

---

1. 42 U.S.C. § 2000e–5(e) (1982); *Simmons v. South Carolina State Ports Authority*, 694 F.2d 63, 64 (4th Cir.1982); *Doski v. M. Goldseker Co.*, 539 F.2d 1326, 1329 (4th Cir.1976).

2. For claims under sections 1981 and 1983 state law provides the proper statute of limitations which, in this case, is the three year period provided by N.C.Gen.Stat. § 1–52(5). *King v. Seaboard Coast Line Railroad Co.*, 538 F.2d 581, 584 (4th Cir.1976) (citing *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 462–66, 95 S.Ct. 1716, 1721–23, 44 L.Ed.2d 295 (1975)).

102 S.Ct. 388, 70 L.Ed.2d 206 (1981), we believe that its proffered reason is legitimate and non-discriminatory.

When Superintendent Nelson, a white male, was appointed in 1971, he instituted new procedures for the selection of principals and assistant principals. Applications for principal were first screened by him and the assistant superintendent of personnel. Subsequently, a committee consisting of Nelson and the assistant superintendents for personnel and instructional support services interviewed the screened applicants. Following the interviews, the committee made a recommendation to the Board, the ultimate selector. Selections of assistant principals were made essentially by the principal of the respective school following interviews by the principal and assistant superintendent of personnel. A principal's recommendation to the superintendent that a person be hired as an assistant principal was tantamount to that person's selection.

In 1977 Nelson decided to alter substantially the selection process for principals while leaving that for assistant principals unchanged. Under the new procedures, Nelson and the assistant superintendent for personnel initially screened the applications for principal. Selected applicants then were interviewed by a committee of four to six people appointed by Nelson or the assistant superintendent of personnel and drawn from the principals or the central staff. Nelson and the assistant superintendent of personnel then interviewed some or all of the persons recommended by the committee. As under the previous selection procedure, the Board ultimately approved or rejected the final recommendations. Nelson testified that the motivations behind the procedural changes in 1977 were: the sheer number of interviews, the belief that committees naturally would counteract the influence of bias, and the belief that committees would likely select successful people.

■ Love correctly observes that this court has stated that subjective evaluations may be subject to strict scrutiny. *See*

*Page v. Bolger,* 645 F.2d at 230. We also have said, however, that "the mere fact that subjective criteria are involved in the reason articulated by an employer does not prevent according it sufficient rebuttal weight to dispel the inference of discrimination raised by the prima facie case." *Id.* (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). Here, the district court credited Nelson's testimony that those appointed to the positions in question were more qualified than Love. Additionally, there is objective evidence supporting the Board's claim that its decisions were not racially motivated. Although Love had more teaching experience, had taught longer in the Alamance school system, and had more certificates than selectees Burke or Wheeler, the latter two had served as assistant principals while Love had not. Furthermore, Burke, who was selected to be principal in an open school, had served as assistant principal in an open school and strongly supported open education. Love, though supportive of open education, had no experience in it. Wheeler had experience working with computers; Love had not. This objective evidence supports the Board's assertion that it was not racially motivated. It carried its burden of production in articulating a legitimate non-discriminatory reason for not promoting Love, and the demonstration of the considerable difference in the candidates' objective qualifications supports the district court's conclusion that the Board's stated reasons were not pretextual. *Cf. Page v. Bolger,* 645 F.2d at 230 n. 8 (citing *Wright v. National Archives and Records Service,* 609 F.2d 702, 714 n. 13 (4th Cir. 1979) (en banc)) (rough equality in objective qualifications of plaintiff and appointee confirmed district court's assessment that the articulated reason was legitimate).

### III.

■ As we have stated, the district court found that under the *McDonnell Douglas—Burdine* analysis Love established a prima facie case and that the Board rebut-

ted Love's prima facie case by articulating a legitimate non-discriminatory reason for not promoting her—namely, that she was relatively less qualified. Although the burden of production shifted to the Board to articulate such a reason, the burden of persuasion rested with Love throughout the trial.

■ Love, however, contends that the *McDonnell Douglas—Burdine* analysis is not applicable to the facts of this case because the Board's historical and allegedly recent and continuing acts of discrimination required shifting the burden of persuasion to the Board to show by clear and convincing evidence a lack of discrimination. If, in fact, the Board recently had operated a discriminatory system, this would be a valid argument. *See Knighton v. Laurens County School District No. 56*, 721 F.2d 976 (4th Cir.1983); *Evans v. Harnett County Board of Education*, 684 F.2d 304 (4th Cir.1982). The record, however, does not support this allegation.

Alamance County operated a segregated school system until the late 1960's when, under court order, it began the process of desegregation. By 1970 the system had desegregated the teaching staff. The Office of Civil Rights (OCR), a federal agency with significant powers over school desegregation efforts, accepted the Board's desegregation plan in September 1971. No black principal was displaced or dismissed as a result of desegregation rezoning after 1971.

In August 1974 OCR advised Superintendent Nelson of its criticism of an inter-district transfer policy which it linked to excessive black enrollment at two schools and its belief that blacks were underrepresented among school administrators. OCR demanded corrective action before the 1974-75 school year to ensure continued receipt by the system of Emergency School Aid Act funds. The Board adopted an Affirmative Action Plan (Plan) in May 1975. The purpose of the Plan was "to restore the staff of principals (including principals and assistant principals) and coaches of the School System to its desegregation compo-sition of a 20 percent minority coaching staff and a 20 percent minority principals staff." The Plan specifically provided that until the 20 percent goal was reached for principals, the system would hire at least one new black principal for each new white principal hired. During the 1975-76 school year, the school system hired two blacks and two whites as principals. It also hired another white as an assistant principal. By 1976, the system achieved 20 percent black representation among principals and assistant principals. During the 1976-77 school year, blacks filled six of the thirty principal and assistant principal positions within the system.

It is true that the school system did not meet some of the other goals of the Plan. The major shortcomings related to formal selection procedures. Despite the Plan's requirement that applicants be evaluated "pursuant to written, objective, and lawful employment criteria," the system used selection procedures involving predominantly subjective evaluations. The system also failed to use standardized written evaluation forms, the purpose of which was to permit accurate comparisons of applicants. Contrary to the requirements of the Plan, the system never issued explanations as to "why the successful candidate was the most appropriate person for the position." Standardized procedures, however, were utilized. All witnesses with experience in the selection procedures testified that applicants were subjected to the same questioning and analysis by Nelson and the selection committees.

We have recently considered the issue which Love now raises—the shifting of the burden of persuasion to the defendant in discrimination cases. In *Evans v. Harnett County Board of Education*, 684 F.2d 304 (4th Cir.1982), a black former school principal claiming disparate treatment established that seven years after desegregation race discrimination continued to pervade a school district's personnel practices. He attributed to continuing discrimination the school board's rejection of his application for the position of principal at a formerly

white school. We held that the application of the *McDonnell Douglas—Burdine* analysis was inappropriate:

> While these principles govern the evaluation of most Title VII claims based on a disparate treatment theory, the courts repeatedly have concluded that shifting the burden of persuasion to the defendant is proper in certain circumstances. Primary among the conditions warranting this shift is a finding of either intentional segregative action or a recent history of racial discrimination in a school system.

*Id.* at 307 (citing *Keyes v. School District No. 1*, 413 U.S. 189, 208–10, 93 S.Ct. 2686, 2697–98, 37 L.Ed.2d 548 (1973); *Chambers v. Hendersonville City Board of Education*, 364 F.2d 189, 192 (4th Cir.1966)). Because the district court found an existing pattern whereby whites were chosen as principals of formerly all white schools and blacks as principals of formerly all black schools, we remanded the case for consideration with the burden of persuasion shifted to the defendants. A year later, in *Knighton v. Laurens County School District No. 56*, 721 F.2d 976 (4th Cir.1983), we approved *Evans'* shifting of the burden of persuasion and made clear that the "defendant's burden to justify its conduct requires clear and convincing evidence." *Id.* at 978.

In the instant case, however, Love has failed to demonstrate either "intentional segregative action or a recent history of racial discrimination." *Evans v. Harnett County Board of Education*, 684 F.2d at 307. The Alamance County school system was desegregated fifteen years ago. While it is true that by 1974 the number of black administrators had declined from five to two, by 1976 the school system had achieved (and has since maintained) the goal of 20 percent minority representation among principals as required by the 1975 Affirmative Action Plan. Unlike the plaintiffs in *Evans* and *Knighton*, Love has

presented no evidence showing recent discriminatory practices. In *Evans* the court found a contemporaneous discriminatory assignment practice, while in *Knighton* the court found that the plaintiff had presented evidence showing ongoing discriminatory evaluation procedures.

Love contends that the Board's failure to adopt objective criteria for the selection of principals as required by the Plan is evidence of continuing discrimination. Failure to follow the requirements of an affirmative action plan, however, is not conclusive evidence of racial discrimination. *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.) (en banc), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981). There was a heavy presence of women and blacks on the selection committees.[3] This was an intentional safeguard against discriminatory practices. *See id.* at 231 (employer's efforts to insure minority representation on promotion committee are probative of his likely motivations for the ultimate employment decision); *Wright v. National Archives and Records Service*, 609 F.2d 702, 714 (4th Cir.1979) (en banc) (fact that three out of five evaluators were black was significant to issue of discriminatory rating). Further, although the formal selection criteria were weakened by subjectivity, they were standardized and applied evenhandedly. Nelson's unrebutted testimony was that he instructed members of the selection committees to use their best professional judgment when selecting applicants for recommendation. One committee member, a black female, testified that all applicants were asked basically identical questions— questions which were fair and job-related. Even Love agreed that the questions of the several committees before which she appeared were similar and job-related, and that each committee member asked questions concerning matters within that individual's expertise. The selection process was not perfect, but by viewing all the

---

**3.** The five member selection committee that interviewed Love for the 1977 principal position at B. Everett Jordan Elementary School included three females, two of whom were black. The four-member selection committee that interviewed Love for the 1978 principal position at the same school included two females, one of whom was black.

evidence we are persuaded it was not administered in a discriminatory manner.

At trial, Love also presented raw data which she claimed showed a pattern of discrimination in the selection of assistant principals from 1975 to 1983. Relying on the testimony of a statistician who analyzed Love's data, the district court found no statistical evidence of a discriminatory pattern of selection.[4] We see no reason for disturbing these findings. Furthermore, Love's most recent example of a discriminatory act, OCR's finding of a discriminatory non-promotion of a black during the 1973–74 school year, occurred at least three years before the first of Love's alleged discriminatory non-promotions challenged in this appeal. Since that incident, OCR has not complained about any other personnel practice or decision of the Alamance Board. In sum, we agree with the district court that Love showed neither "intentional segregative action [n]or a recent history of racial discrimination" that would require shifting the burden of persuasion to the Board. Moreover, even if that were required, the Board, in fact, proved by clear and convincing evidence that its decisions were not racially motivated.

### IV.

The final issue relates to the third position for which Love alleges discriminatory treatment, that of assistant principal at Western Middle School. Nelson and an assistant superintendent each testified that Love had withdrawn her application. Although Love adamantly denied this, the district court resolved this discrepancy in favor of the defendant. We see no reason to disturb this finding which rested largely upon assessments of credibility. Upon the district court's finding that she withdrew her application, Love failed to establish a

prima facie case of discriminatory non-promotion at Western Middle School.

### V.

In sum, we believe that under the strict scrutiny required by the Board's use of subjective criteria, the Board's reason that Love was less qualified rebutted her prima facie case and was not pretextual. Further, the facts of this case do not warrant shifting the burden of persuasion to the Board and, even if they did, we believe that the Board showed by clear and convincing evidence a legitimate, non-discriminatory reason for its refusal to promote Love. Finally, the district court's determination that Love withdrew her application for principal at Western Middle School is not clearly erroneous. The judgment of the district court is

AFFIRMED.

---

**4.** Dr. Jane Harworth, Ph.D., an expert in statistical analysis, examined applicant flow and hiring data for 1975–1983 and performed a binomial distribution analysis. When the raw data involved small pools, she utilized the Fisher's Exact Test, a more precise version of the Student T Test. Dr. Harworth testified that there is no statistical support for the allegations of the existence of a non-neutral policy or of a pattern or

practice of discrimination against blacks or females. Her analysis showed that the actual numbers of black or female hirees were within the range of two standard deviations. She further observed that the success rate of blacks and females exceeded whites and males, respectively. Love offered no statistical evidence disputing Dr. Harworth's calculations or conclusions.