Olivia J. **FEATHERSON**

v.

**MONTGOMERY COUNTY PUBLIC SCHOOLS, et al.**

Civ. No. JFM–88–2716.

United States District Court, D. Maryland.

June 18, 1990.

David H. Shapiro, Kator, Scott & Heller, Washington, D.C., for plaintiff.

George W. Johnston, Venable, Baetjer & Howard, Washington, D.C., and Baltimore, Md., for defendants.

## MEMORANDUM

MOTZ, District Judge.

Plaintiff, Olivia J. Featherson, has instituted this action against the Montgomery County Board of Education and the individual members of the board under Title VII. 42 U.S.C. § 2000e–5 (1982).[1] Featherson, who is black, claims that she was unlawfully discriminated against because of her race in connection with her unsuccessful efforts to become an elementary school principal. She also asserts that she has been retaliated against because she earlier filed a Title VII complaint. Defendants have moved for summary judgment, and their motion will be granted.

---

**1.** Plaintiff initially also asserted claims under 42 U.S.C. § 1981 and 1983 but has now voluntarily dismissed those claims.

## I.

### Plaintiff's Qualifications

Plaintiff has been employed by the Montgomery County Public Schools ("MCPS") as a speech and language pathologist since 1975. Prior to that time, she worked as a teacher of the hearing impaired at Kendall Demonstration Elementary School, where she taught all of the required primary curriculum.

Plaintiff began work with MCPS in 1975 as a therapist with the Head Start Division. In 1980, she received a full-time job as a speech pathologist, dividing her time between two elementary schools. Throughout her tenure as a speech pathologist with MCPS, plaintiff has worked with approximately forty to fifty students per year, teaching groups of students in a classroom-like setting and using instruction materials based on the MCPS curriculum in reading, language arts, and writing process. Her students have speech problems but are of normal intelligence.

Plaintiff has never had responsibility for teaching a single grade at a regular MCPS elementary school. She has never been a "teacher specialist," acting as a resource to other teachers in matters of curriculum and teaching. She has never held a position with MCPS that involved administrative or supervisory duties.

Plaintiff received her doctoral degree in May 1988, after completing her course work approximately two years earlier.

### Employment Decisions Here In Issue [2]

#### The 1986 Assessment Center

In 1986 plaintiff unsuccessfully applied for admission to the MCPS Elementary Principal Assessment Center. "Assessment Centers" are conducted annually, and they are generally the first stepping stone for persons interested in becoming MCPS elementary school principals. An Assessment Center consists of five exercises designed to assess an individual's skills relevant to becoming a principal. The individual must complete the Assessment Center before s/he applies to the Elementary Principal Trainee Program, for which s/he undergoes an application process similar to that discussed below for the Assessment Center. Persons who have completed the Principal Trainee Program are a primary source of new principals for MCPS.

Applications to an Assessment Center are reviewed by a screening committee drawn from the ranks of MCPS administrators and supervisors who are familiar with the duties, functions and responsibilities of an elementary school principal. Each member of the committee has access to the resumes, personnel files and references for each applicant and is provided with a screening form to be completed for each applicant. The committee members work independently and do not confer with one another. They are not told the race of the applicants. After completing his or her review, each committee member completes the screening form and marks each applicant as being "exceptionally qualified," "well qualified," "minimally qualified" or "poorly qualified."

Based upon these marks, the applicants are then numerically scored and ranked by the Department of Personnel Services. A list of the scores (without any information identifying or describing the applicants) is submitted to MCPS' Appointments Committee which determines the score which will serve as that year's cut-off level.

---

**2.** In addition to the claims which she is now pressing, plaintiff (who was then proceeding *pro se*) originally challenged MCPS' failure to hire her for sundry other positions, including Director of Minority Education Coordination and Director of Staffing. She has now abandoned those claims.

Plaintiff's history of filing discrimination charges with the EEOC against MCPS perhaps should also be incidentally noted. She has filed six such charges. The first one, filed in 1980, was resolved amicably between the parties. Plaintiff withdrew a second charge after she was advised by the EEOC that it did not find discrimination. The third, fourth and fifth charges are the ones which underlie the present case. The EEOC found no discrimination in connection with the third, and plaintiff requested and received right to sue letters in connection with the fourth and fifth charges before the EEOC made any determination. The sixth charge was filed after the present action was instituted, and it remains pending before the EEOC.

The names, race and gender of the applicants are then provided to the Committee. Occasionally, in accordance with an affirmative action policy followed by MCPS, women or members of racial minorities whose scores do not qualify them for admission to the Assessment Center are thereafter added by the Committee to the list of Assessment Center admittees.

The 1986 Assessment Center screening committee which reviewed plaintiff's application consisted of nine persons, including five women and two blacks. There were fifty applicants to the Assessment Center; thirteen were minorities. Twenty-six of the applicants were admitted; six of them were minorities. Thus, roughly 23% of those who were admitted were minorities in comparison with the roughly 26% of the minorities who applied. One of the minorities who was accepted was a black male whose score of 29 was one point below the score of 30 initially set by the Appointments Committee as the cut-off level for admission into the Center. Five white candidates also received a score of 29 but none of them were extended an invitation to the Center.

Plaintiff received a total score of 9, placing her in a tie for forty-seventh place on the list of fifty applicants.[3] None of the nine screeners rated plaintiff in the highest category of "exceptionally qualified." Only one screener gave plaintiff a "well qualified" rating, and this screener was white. Six of the screeners rated her as only "minimally qualified," and the other two rated her as "poorly qualified." One of the black screeners rated plaintiff as "poorly qualified," and the other rated her as "minimally qualified." Only one of the screeners knew that plaintiff was black, and he did not communicate this informa-

tion to his colleagues. There is no evidence that any members of the committee were aware that plaintiff had filed earlier charges of discrimination against MCPS.

The committee members noted various weaknesses in plaintiff's qualifications. Six of them referred in their comments to her lack of regular classroom or curriculum experience. All nine of them noted her lack of any experience as a teacher specialist, and several of them noted that she had not completed either of the recommended in-service courses or the leadership training program. Five committee members rated plaintiff's references as average or below average. In that regard, Dr. Ann Mathias, the principal of the school to which plaintiff was assigned, gave her the third lowest of four possible recommendations ("recommended with reservation"), indicating that plaintiff is an excellent speech teacher but expressing concerns about the quality of suggestions which she made as a participant in the educational management team process.[4]

*The 1987 Assessment Center*

In March 1987 an advertisement was published in MCPS' *Bulletin*—a newsletter of general circulation for MCPS employees—soliciting applications to the 1987 Assessment Center. Plaintiff concedes that she never submitted an application for admission to the that year's Assessment Center. Only one person, Amanda Winters, who did not submit an application, was selected for the 1987 Assessment Center. Winters is black. Also, in contrast to plaintiff, Winters had been serving as an acting assistant principal of an MCPS high school and thus had significant supervisory and administrative experience. Her admission into the 1987 Assessment Center was in furtherance of MCPS' practice of identify-

---

3. Plaintiff has placed some emphasis upon the fact that she has a doctorate. Aside from the fact that plaintiff did not obtain this degree until May 1988, after the events at issue in this case, it is noteworthy that a white applicant for the 1986 Assessment Center, who already had her doctorate and who had ranked higher than plaintiff (34th), was also rejected. This same white applicant and another white candidate with a doctorate were subsequently rejected from the 1987 Assessment Center.

4. Plaintiff argues that Dr. Mathias should not have been asked by the committee to submit a reference because she was not plaintiff's immediate supervisor. However, the record establishes that a reference was requested from Dr. Mathias in accordance with established procedure.

ing and encouraging qualified minority administrators to seek promotion within the system.

*Acting Assistant Principal Positions*

The only elementary schools in Montgomery County which have assistant principals are those with an enrollment which exceeds 600 students. There are 27 or 28 such schools out of more than 100 elementary schools in the system. Ordinarily, assistant principals are not permanently appointed but are assigned on an acting basis.

Acting assistant principals are generally chosen from one of four pools: (1) graduates of the Assessment Center and Elementary Principal Trainee Program who have not yet received an appointment to a principal position; (2) graduates of the Assessment Center who were close to the cut-off for admission into the Principal Trainee Program; (3) other persons with both demonstrated potential for and interest in being an administrator; and (4) candidates employed at a school where unforeseen circumstances have created a vacancy requiring immediate assignment. The appointments are usually made at the recommendation of the associate superintendent of the area in which the school is located. Generally, the superintendent looks to persons working within his/her district in making recommendations.

There were two associate superintendents for the area in which plaintiff worked throughout the period relevant to this lawsuit, both of whom were black males. One of them had met plaintiff only once and the other had not known or heard of her while he was serving as associate superintendent. Neither of them knew during his tenure as associate superintendent that plaintiff had filed any EEO complaints. Plaintiff asserts that she generally made known within the system her interest in becoming involved in school administration and her wish to apply for assistant principal positions.

## II.

■ Summary judgment is appropriate if there is no *"genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). Facts are material if they would affect the outcome of a case; there is a genuine issue of fact if the evidence would allow a "reasonable jury ... [to] return a verdict for the nonmoving party." *Id.* A mere scintilla of evidence in favor of a nonmoving party is insufficient to defeat a summary judgment motion. *Id.* at 251, 106 S.Ct. at 2511. (citation omitted). However, especially in an employment discrimination case, where the employer's state of mind necessarily is a critical determination, a court must find that it is "perfectly clear" that there are no genuine issues of material fact before granting summary judgment. *See Ballinger v. North Carolina Agricultural Extension Service,* 815 F.2d 1001, 1004–05 (4th Cir.1987), *cert. denied,* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987).

## III.

■ Plaintiff's claim for retaliation needs only cursory discussion, as she has failed to establish even a *prima facie* case. A *prima facie* case of retaliation requires evidence of the following: (1) the employee engaged in a protected activity; (2) the employer then took adverse action against the employee; (3) there is some causal connection between (1) and (2). *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989) (citing *Ross v. Communicators Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds, Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

■ There is absolutely no evidence that the persons involved in any of the alleged adverse decisions affecting Featherson, i.e. her non-admission to the Assessment Centers and her non-appointment to acting assistant principal positions, knew at the time that the decisions were made that plaintiff had filed any EEO claims. Plaintiff argues that the knowledge of other representatives of MCPS should be imputed to the persons who made the decisions in question. This is nonsense. As a matter of logic and of fact, a person cannot make an

adverse, retaliatory decision based upon information of which s/he is unaware. *See Ross,* 759 F.2d at 365 n. 9 ("if the employer did not know of the protected activity a causal connection to the adverse action cannot be established").

## IV.

■ The *McDonnell Douglas* protocol applies to plaintiff's discrimination claims regarding the 1986 and 1987 Assessment Centers and the acting assistant principal positions. Under that protocol: (1) plaintiff must first establish a *prima facie* case; (2) defendant must then articulate a legitimate, nondiscriminatory reason for its action; and (3) plaintiff must then demonstrate that the reason articulated by defendant is pretextual. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Texas Depart. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Williams,* 871 F.2d at 455–56.

■ In order to establish her *prima facie* case, plaintiff must show that (1) she was a member of a protected class; (2) she applied and was qualified for a job for which MCPS was seeking applicants; (3) that, despite her qualifications she was rejected; and (4) after her rejection, the position remained open and the employer continued to seek applicants from persons of her qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 253 & n. 6, 101 S.Ct. at 1094 n. 6.

■ As a preliminary matter, summary judgment is obviously appropriate on plaintiff's claim regarding the 1987 Assessment Center due to her failure to establish a *prima facie* case. It is undisputed that she did not make the required application to the Assessment Center, and she has offered no evidence excusing this failure to apply. She says that she did not apply because she knew that she would be rejected because of her race. As a general proposition, a plaintiff can be excused from applying for a desired position if such an application would have been futile. *See*

*Teamsters v. United States,* 431 U.S. 324, 365–68, 97 S.Ct. 1843, 1869–71, 52 L.Ed.2d 396 (1977); *Holsey v. Armour & Co.,* 743 F.2d 199, 208–09 (4th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985). However, there is absolutely no objective evidence to support plaintiff's subjective claim of futility.

The Court in *Teamsters* noted that an employer's policy of discrimination "can be communicated to potential applicants ... by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his response to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups." 431 U.S. at 365, 97 S.Ct. at 1870. These factors all cut against plaintiff's claim of futility here. MCPS ran a general advertisement for both the 1986 and 1987 Assessment Centers in March of the respective year. Blacks were significantly represented on Assessment Center screening committees. The percentage of blacks admitted to the 1986 Assessment Center was approximately the same as their percentage in the applicant pool, and the percentage of blacks admitted to the 1987 Assessment Center (22%) actually exceeded their percentage in the applicant pool (16%). Moreover, in accordance with MCPS's affirmative action policy, a black man who did not meet the minimum cut-off score was admitted to the 1986 Assessment Center, and a black woman with prior administrative and supervisory experience was recruited to be admitted into the 1987 Assessment Center even though she had not submitted an application.

■ As far as the 1986 Assessment Center and the acting assistant principal positions, defendant concedes that plaintiff has proved the first, third and fourth elements of the *prima facie* case. However, regarding the second element, defendant contends that plaintiff has not proved that she was qualified for any of the positions to which she applied and alleges she should have been appointed. I need not decide the is-

sue thus presented because, assuming that plaintiff has made out a *prima facie* case, defendants are nevertheless entitled to summary judgment. They have clearly articulated a legitimate non-discriminatory reason for the decisions made by MCPS— the selection of candidates on a race-neutral basis whom MCPS administrators deemed to be more qualified than plaintiff—and plaintiff has not presented sufficient evidence from which I could find, as the finder of fact, that this articulated reason is pretextual.

### The 1986 Assessment Center

The background facts as stated above demonstrate that, viewed macrocosmically, the process followed by MCPS in selecting the admitees to the 1986 Assessment Center did not discriminate against any minority applicant, including plaintiff. Blacks were fairly represented on the screening committee. The members of the screening committee were not informed of the race of any applicant. The percentage of minorities accepted to the Assessment Center was substantially the same as the percentage of minority applicants in the entire pool. An objective scoring system was used, and the scores were derived from an evaluation system which, although inevitably calling for some subjective judgments relating to management capabilities, *see, e.g., Smith v. Univ. of North Carolina*, 632 F.2d 316, 345 (4th Cir.1980) (university professor); *EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 726 (4th Cir.1980) (casualty underwriter), also included objective factors. One minority applicant who fell below the numerical score which had been selected as the cut-off level on a race-blind basis was subsequently admitted in furtherance of a MCPS policy of recruiting and promoting qualified minorities.

This evidence establishes overwhelmingly that MCPS made its decisions as to whom to admit to the 1986 Assessment Center on the basis of the applicants' relative merits. To the limited extent that the process followed by MCPS was not race-neutral, it favored the admission of minority candidates. Plaintiff has not pointed to a single person who was accepted to the 1986 Assessment Center whom she alleges was less qualified than she[5] and, in any event, she had produced no evidence to rebut defendants' impressive showing of the purity of their established procedures.

In fact, this case involves a principal selection process with greater safeguards against discrimination than the factually analogous process found by the Fourth Circuit to be nondiscriminatory in *Love v. Alamance County Bd. of Educ.*, 757 F.2d 1504 (4th Cir.1985). *Love* also involved a black plaintiff's claim of discrimination in the defendant school board's failure to promote her to various principal positions. In concluding that the multi-phase selection process at issue was administered in a nondiscriminatory fashion, the Court cited the racial and gender diversity on the selection committees, the standardized and evenhanded application of the selection criteria (though admittedly weakened by subjectivity), the instructions to the selection committee members to use their best professional judgment, and the job-relatedness of questions asked by applicants. *Id.* at 1509 (citations omitted).

### Acting Assistant Principal Positions

■ The process established by MCPS for selecting acting assistant principals is less formalized than the process for selecting admitees to Assessment Centers. Theoretically, because that selection process is less formal and does depend in large part upon the recommendation of area associate superintendents, it could be subjected to

---

**5.** Plaintiff alleges that Judith Gaston, whose qualifications she questions, was admitted to the 1986 Assessment Center. However, defendants have proved that Gaston's score of 29 was one point below the cut-off level of 30 and that the only applicant to the 1986 Assessment Center with a score of 29 who was accepted was a black male. Furthermore, as discussed *infra*, in connection with Gaston's appointment to an as-

sistant principal position, there is no basis for inferring from the relative qualifications of Gaston and plaintiff that a decision in favor of Gaston would have been motivated by racial considerations. The same is true as to Dawn Ellis–Marlin whom plaintiff also asserts was admitted to the 1986 Assessment Center. *See* footnote 6.

abuse. *Cf. Rock v. Norfolk & Western Railway Co.*, 473 F.2d 1344, 1347 (4th Cir.) *cert. denied*, 412 U.S. 933, 93 S.Ct. 2754, 37 L.Ed.2d 161 (1973) (continued use of word-of-mouth hiring and job assignment system disallowed as tending to perpetuate discrimination against blacks). However, plaintiff has made absolutely no showing that this potential for abuse has resulted in discrimination against her. ·In that regard, it is undisputed that, for the particular acting assistant principal positions plaintiff disputes, she would have to have been recommended by associate superintendents who are themselves black.

Again assuming that plaintiff has proved, as required to establish her *prima facie* case, that she was qualified to be an assistant principal, she has produced no evidence to demonstrate that she was not selected for any assistant principal position because of her race. She has focused upon four individuals who were selected for such positions and whose qualifications she alleges were comparable to hers. However, an employer does not bear the burden of proving "by objective evidence that the person hired or promoted was more qualified than the plaintiff," *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096, and plaintiff has utterly failed to demonstrate that her qualifications were so far superior to those who were selected that an inference of racial animus can be drawn. *Compare Bishopp v. District of Columbia*, 788 F.2d 781, 787 (D.C.Cir.1986) (promotion of black man over four white men who were all objectively better qualified probative of defendant's motivation). To the contrary, the evidence establishes that if plaintiff had applied for any of the assistant positions in question, the persons who were in fact selected were better qualified than she. I will briefly discuss the qualifications of those persons. Each of them is a white female.

*Judith Gaston.* In May 1986 it became necessary to appoint for one month an acting principal at Jackson Road Elementary School when the principal of that school announced his retirement. Gaston was a guidance counsellor at the school and had previously functioned as an acting principal when the principal had been out of the building on temporary basis. The area superintendent, a black male, appointed Gaston as acting principal upon the recommendation of the retiring principal.

Gaston's appointment was self-evidently reasonable in order to provide continuity at the school. There was no reason for the area superintendent to think of plaintiff, who had no connection with Jackson Road Elementary School and no prior administrative experience, as a suitable person to be brought in to serve as acting principal.

In November 1986 an assistant principal position opened at Wheaton Woods Elementary School, and the same area superintendent (after interviewing several candidates) recommended Gaston for that position. Again, the fact that he did not consider plaintiff for that position cannot reasonably be attributed to racial animus. By November 1986 Gaston had acquired significant administrative experience and demonstrated her administrative ability by successfully meeting the challenge which opportunity had presented to her at Jackson Road.

*Dawn Ellis–Marlin.* In February 1986 Dawn Ellis–Marlin was appointed as acting assistant principal at the Fox Chapel Elementary School to fill a vacancy which then occurred. Ellis–Marlin was recommended for the position by a black area superintendent. She was teaching in a regular elementary classroom when she was appointed to the Fox Chapel position. Ellis–Marlin had been working in the MCPS system for only five months before her appointment but, prior to that time, she had served as an assistant principal in a public school in Virginia. Plaintiff merely contests the relevancy of Ellis–Marlin's undisputed prior administrative and supervisory experience, which raises no inference that plaintiff was the victim of race discrimination.[6]

---

6. Plaintiff asserts that, in addition to being appointed as an acting assistant principal Ellis–

Marlin was also admitted to the 1986 Assessment Center. Her name does not appear on

*Susan Marks.* In 1985, the principal of Oak View Elementary, Dr. Elizabeth Morgan, who was experiencing medical problems, specifically requested that Susan Marks be assigned as a parttime acting assistant principal. As Marks brought, in contrast to plaintiff, unique qualifications to the job, the black associate superintendent recommended her assignment.

Oak View Elementary School is a "magnet" school which draws diverse students from all over Montgomery County. In 1985 it was implementing a language immersion program, involving French, Spanish and English curricula. Dr. Morgan originally brought Marks to the school as curriculum coordinator because of her rich and varied background. Marks had been a speech pathologist, a resource teacher, and a teacher of the emotionally impaired. She was also familiar with the gifted and talented curriculum. She spoke Spanish and became conversant in French. She had earned the respect of parents and staff in her work on the curriculum.

At Oak View she assisted Dr. Morgan in various administrative duties. During her tenure as a half-time administrator, Marks exhibited impressive administrative and leadership abilities. Consequently, in the summer of 1986, when Morgan took a temporary leave of absence, the area superintendent recommended that Marks be appointed as acting principal.

At the beginning of the 1986–87 school year, an acting assistant principal position opened at Oakland Terrace Elementary School, and, upon the recommendation of the area superintendent, Marks received the appointment.

*Sherri Rindler.* Sherri Rindler had held an administrative and supervisory position in the MCPS system since 1979. Because of a reorganization of the division in which she worked, her position was eliminated beginning with the 1985–86 school year. In accordance with established policy and practice, Rindler was entitled to remain in an administrative and supervisory position. She was therefore assigned in such a capacity as a teacher at the Lynnbrook Group Home. The following year she was placed as an acting assistant principal at Diamond Elementary School, serving as an administrative intern. Having successfully served her internship, a year later she was appointed as an assistant principal at Oakland Terrace Elementary School.

These four individuals clearly had qualifications for the positions to which they were appointed which were as good as, indeed better than, plaintiff's.[7] There is no basis whatsoever for inferring from their promotions that defendants were racially motivated in not appointing plaintiff as an assistant principal.

A separate order granting defendants' motion for summary judgment is being entered herewith.

### ORDER

For the reasons stated in the memorandum entered herein, it is this 18th day of June 1990.

ORDERED

1. Defendants' motion for summary judgment is granted; and

2. Judgment is entered in favor of defendants against plaintiff.

that Assessment Center's screening grid, and it therefore does not appear that she was one of the applicants in 1986. In any event, her administrative experience distinguishes her from plaintiff.

7. In opposing summary judgment plaintiff also focuses upon three other persons, Anna Ossler, Myra Abramovitz and Sally Veres. None of the three are relevant to plaintiff's claims. Veres was accepted to the 1985 Assessment Center, and Ossler and Abramovitz were admitted to the 1987 Assessment Center. Plaintiff applied to neither. In any event, I have reviewed the qualifications of these three individuals (as well as others whom plaintiff apparently mentioned during the course of discovery and whose situations defendants addressed in the memorandum in support of their motion for summary judgment), and, again, they were at least as well qualified as plaintiff.